PASCHALL et al. v. GULF, C. & S. F.
RY. CO. et al.

No. 12002.

Court of Civil Appeals of Texas. Dallas.
Nov. 7, 1936.

Rehearing Denied Dec. 5, 1936.

. Smithdeal, Shook, Bowyer & Lefkowitz, of Dallas, for appellants.

Lawther & Cramer, of Dallas, Wren, Pearson & Jeffrey, of Fort Worth, and Terry, Cavin & Mills, of Galveston, for appellees.

JONES, Chief Justice.

This suit was instituted by Mrs. Alecia B. Paschall, the surviving wife of W. E. Paschall, for herself and minor children of their marriage—W. E. Paschall, Jr., Charles E. Paschall, and W. L. Paschall—to recover damages, both actual and exemplary, for the death of W. E. Paschall, against the Gulf, Colorado & Santa Fe Railway Company and Grover S. Campbell. The Railway impleaded Dallas county as codefendant, and also filed a cross-action against Campbell, and Campbell in turn filed a cross-action against the Railway Company. The respective cross-actions by the codefendants were based upon allegations by each defendant that the other was guilty of primary negligence which caused the death of Paschall, and each sought judgment over against the other for the amount of the judgment plaintiffs recovered. The Railway impleaded Dallas county because of an indemnity contract executed in its favor by the county.

The plaintiffs will be here designated as appellants. The defendant Railway Company will be designated as Railway, and Grover S. Campbell will be designated as Campbell.

A general demurrer was sustained to the cause of action alleged against Dallas county, and as Railway declined to amend, its suit against Dallas county was dismissed. There was no appeal from this judgment of dismissal, hence Dallas county is not a party to this appeal. A trial was had to a jury and the case as between appellants, the Railway and Campbell, was submitted to the jury by 102 special issues. While this is an unusually large number of issues to be submitted to a jury, we are of the opinion that each issue calls for a finding on an ultimate issue of fact, the finding on which may have become necessary for a proper judgment in the case. No issue was submitted on the cross-action of Railway against Campbell or of Campbell against Railway, and no complaint is made on this appeal by either of said parties, because of the failure to submit such an issue. All of the issues submitted by the court, as between appellants and Railway, were determined by the jury in favor of Railway; likewise, all of the issues submitted in the case of appellants against Campbell were found in favor of Campbell. In accordance with these findings, the trial court entered judgment in favor of Railway and Campbell, and against appellants in their suit against each of said parties. The appeal is duly perfected to this court, and the following are the facts necessary to this review:

In 1923, Railway desired to build a track from Hales' Switch, on its line in Dallas county, approximately 8 miles in length to what is described as the "West Dallas Industrial District," and by deed of conveyance secured title to a narrow strip of land from Hales' Switch to said district. Where the roadway in question crosses this right of way, a conveyance of 100 feet in width for the right of way was made to the Railway on June 2, 1923, and this deed was duly recorded. After the construction had begun on this right of way, on May 17, 1924, an injunction was issued by a federal court against the construction of this short line of railway, to remain in force until railway obtained from the Interstate Commerce Commission permission to construct same. This permission was given May 25, 1929. During the intervening time, nothing was done by Railway in respect to its use of the right of way it had secured.

While this injunction was in force, Dallas county laid out and established the public road in question across Railway's right of way, such road being designated as the "Jefferson Road Extension." Some distance beyond the right of way crossing, the Jefferson Road Extension connected

with a road known as "the old Fort Worth pike," thereby making a continuous highway from the city of Dallas into the city of Fort Worth. In building the Jefferson Road Extension, there was appropriated by Dallas county for the use of the highway a strip of land belonging to Railway, at least 40 feet wide and 100 feet in length. This appropriation was made by Dallas county without legal notice to Railway, without any consideration to Railway for such use and occupancy of its land, and without any agreement between the county and Railway as to such use of the Railway's land, although Railway's engineer knew, in 1926, the Jefferson Road Extension was being constructed as a public road. Some two or three years after the Jefferson Road Extension was established by Dallas county as a public road, but while the injunction against Railway was in force, this road was paved by the proceeds of a bond issue made available for such purpose.

When the injunction that had theretofore prevented Railway from constructing the track in question came to an end Railway was at liberty to construct the railway track, it was confronted with the fact that the county had located and paved the Jefferson Road Extension across its right of way, without any compensation for the use of its land occupied by the road. Under such condition, the Railway did not have the right to ignore or destroy the crossing over its right of way, but did have the right to demand of the county remuneration for the taking of its land for such purpose, and to secure same either by agreement with Dallas county or by proper court proceedings. Dallas county, through its commissioners court, recognized this right of Railway, and, by agreement between the parties, all matters in this respect were settled. This agreement was in writing and entered into February 13, 1930. Under its terms, the county secured an overhead crossing over said public road and on Railway's right of way, the road to pass through a tunnel 20 feet wide with a 12-foot overhead clearance. This construction was to be made by Railway, but the county obligated itself to pay half of the costs and there were other considerations, some of which will be mentioned later.

On May 22, 1930, before any of the work provided for in the contract of February 13, 1930, was begun, the county, acting through the commissioners, and the Railway entered into what is termed a "supplemental agreement."

This supplemental agreement was entered into in order to accede to the request of the county that an additional span for the public road be constructed and to meet this request, Railway granted to the county the use of 26 additional feet for an additional roadway under plans and specifications submitted to, and adopted, by the county. The additional agreement provided for another 20-foot roadway construction, and for the construction of a pier to be 6 feet wide and 18 feet long, to support the Railway construction over the two 20-foot spans of the road. Some other considerations were stated, but are not necessary here to name. The county was to pay one-half of this additional construction. Under the terms of these contracts, the county was granted for road purposes the use of a strip of land 46 feet wide, 6 feet of which was to be occupied by the said pier, and 20 feet on each side of the pier to be used as a public road. The pier when constructed occupied 6 feet and 8 inches of the 46 feet, thereby lessening the width of each roadway 4 inches. Among other things, Dallas county agreed to light the tunnel at its own expense when lighting was deemed necessary by the Railway. Each of the ends of the pier had black and white boards nailed thereon alternately, for the view of motorists. No signal lights of any character were placed either in the tunnel or on the ends of the pier. There was no obstruction to the view of the motor traffic for a distance of 450 feet at either end of the pier. The lighting of the tunnel and pier at night was left entirely to the headlight of an on-coming motor vehicle.

Deceased, W. E. Paschall, was in the picture show business, owning and operating a number of picture shows in the state of Texas. Campbell was associated with deceased as a district manager, and the two were close personal friends. On the occasion in question, deceased had just returned from a business trip to the city of New York. Appellants (the wife and three minor children) were in the city of Corpus Christi, and Campbell arranged a dinner party, at which deceased, a Miss McCormick, and a Miss Tilton were his invited guests. The parties met in deceased's room at the Baker Hotel and, after remaining approximately an hour, it

was agreed that they would go to Park Inn, a suburban dining place some miles out from the city of Dallas, on or near the Fort Worth pike. This was on the night of July 17, 1933. After leisurely partaking of the meal in the main dining room, and later engaging in dancing until about 1 a. m., the party concluded to return to Dallas. The car that transported them, both to and from Park Inn, was owned and operated by Campbell, it being a Packard four-passenger coupé. In going out to Park Inn and in attempting the return trip, Campbell and Miss Tilton rode on the front seat and deceased and Miss McCormick rode on the rear seat. While the parties were in the Baker Hotel, some liquor had been drunk, but the evidence is undisputed that none of them were intoxicated, and no liquor appears to have been drunk after they left the Baker Hotel.

At this time, the regular Fort Worth pike was being repaired and widened, and all traffic from Fort Worth was detoured over the old Fort Worth pike. This pike was intersected by means of the Jefferson Road Extension, and this extension went under the Santa Fe track at the overhead crossing, above described. So, in going to Park Inn, Campbell operated his car through the underpass, and attempted to do so on the return, but the car collided with the end of the pier with such force as to completely wreck it, especially as to the front part of the car, with the result that deceased and Miss McCormick were instantly killed, and Campbell and Miss Tilton were seriously injured. A V-shaped curbing was constructed by the county of Dallas at each end of the pier. The point of this curbing was some 4 or 5 feet from the center of the pier. The curbing was some 4 to 5 inches high. Campbell testified that he believed he could have missed the pier, but for this curbing which prevented his swerving his car to the right.

█ The testimony as to the speed of the car, at the time of the collision, is in sharp conflict, Campbell testifying that the speed was at the rate of 35 miles an hour, Miss Tilton testifying that it was at a much greater rate of speed. The jury found the speed to be 35 miles an hour, and as this finding is supported by Campbell's testimony, it is binding on this court. The passengers of some cars which Campbell passed before he reached the point of collision testified to the speed of the car at this time. This testimony corroborated that of Miss Tilton, but the jury's finding is conclusive on this appeal.

There is also testimony by Miss Tilton that the car was driven on the return trip virtually the entire way to the place of collision at a very dangerous rate of speed, and that it was driven so as to "wabble" from one side of the road to the other, and at times it was driven in the center. The physical facts show that the hood of the car collided with the pier to the left of its center as the car approached the crossing. Campbell's testimony is that he did not see the pier until he was almost upon it, when he attempted to swerve to the right, and a wheel struck the left prong of the V-shaped curbing, which prevented the car from clearing the pier. Campbell did not undertake to explain why he did not see the pier sooner. Miss Tilton testified that, for some time before they came to the crossing, Campbell would look back and talk to those in the rear seat, but does not remember whether he was doing so just before the collision. Neither the pier nor the tunnel was lighted, but there is evidence that the light of approaching cars would illuminate the pier at night for a distance of about 450 feet.

In respect to the suit against Railway, the jury found on special issues submitted that (1) Railway was not guilty of negligence in building and maintaining the pier dividing Jefferson Road Extension into two passage ways; (2) that Railway was not guilty of negligence in building and maintaining the pier of the size it was constructed; (3) Railway was not guilty of negligence in the failure to place warning lights on the pier in question; (4) Railway did not fail to place sufficient signals or signs on or near the pier in question. The issue of "gross negligence" of Railway was submitted, but, under the above findings, was necessarily found by the jury in favor of Railway. These findings were sustained by substantial evidence, are binding upon this court, and are adopted as the findings of this court.

In respect to the suit against Campbell, the jury found that (1) Campbell drove his car between Park Inn and the underpass at the rate of 35 miles per hour; (2) in driving said car at said rate of speed, Campbell was not acting heedlessly and in reckless disregard of the rights of others; (3) Campbell, while driving between

Park Inn and the underpass, drove the car a part of the time on the wrong side of the road; (4) Campbell, in driving his car on the wrong side of the road a part of the time between Park Inn and the underpass, was not acting heedlessly and in reckless disregard of the rights of others; (5) Campbell, in driving from Park Inn to the underpass in question, drove his car in the middle of the road a part of the time; (6) Campbell, in driving his car in the middle of the road a part of the time, was not acting heedlessly and in reckless disregard of the rights of others; (7) Campbell, in driving from Park Inn to the underpass, drove his automobile a part of the time from side to side of the road; (8) Campbell, in driving his car from side to side of the road, was not acting heedlessly and in reckless disregard of others; (9) Miss Tilton did not protest to Campbell because of the manner in which he was driving the car between Park Inn and the underpass; (10) in driving the car between Park Inn and the underpass, Campbell did not fail to keep a proper lookout while driving along said road; (11) Campbell, in driving the car at the speed it was being driven, or in driving the car in respect to the position of the car on the road, or by a failure to heed any protest and warning as to the manner of driving, or as to failure to keep a proper lookout down the road, was not guilty of heedless and reckless disregard of the rights of others; (12) Campbell was not guilty of gross negligence at the rate of speed he was driving the car on the occasion in question; (13) Campbell was not guilty of a willful omission in driving his car at the rate of speed it was driven; (14) Campbell was not guilty of gross negligence in driving the car on the wrong side of the road a part of the time; (15) Campbell was not guilty of a willful omission when he drove the said car on the wrong side of the road; (16) Campbell was not guilty of gross negligence in driving his car in the middle of the road; (17) Campbell was not guilty of a willful omission in driving the car in the middle of the road; (18) Campbell was not guilty of gross negligence in driving the car from side to side of the road; (19) Campbell was not guilty of a willful omission by driving his car from side to side; (20) Campbell was not driving the car at and immediately before the accident in question, at an excessive rate of speed under the circumstances then existing; (21) Campbell was not driving his car at, or immediately before, the time of the accident at a rate of speed in excess of 45 miles per hour; (22) Campbell, as he approached the underpass, failed to heed the warning of the flash sign on the side of the underpass, but by such failure he was not guilty of negligence; (23) Campbell, after passing the flash sign on the west side of the underpass, did not fail to slow down and bring his car under control; (24) Campbell drove his car at, or immediately prior, to the accident, on the left side of the center of said roadway, but such failure was not the sole proximate cause of the death of deceased, nor was it a proximate cause of such death; (25) Campbell, as he approached the underpass, failed to keep a proper lookout and by such failure he was guilty of negligence, while not the sole proximate cause of the death of deceased, was a proximate cause of such death; (26) Campbell, by the exercise of ordinary care, could have seen the pier in time to have reduced his speed sufficiently to enable him to pass on the right side of the pier, but such failure was not the sole proximate cause of the death of deceased, nor was it a proximate cause of such death.

In response to a special issue, the jury found that deceased's death was the result of an unavoidable accident, but, in view of the contradictory finding that such death was proximately caused by the negligence of Campbell, such finding as to "unavoidable accident" cannot be considered. On these findings the trial court entered judgment against appellants as to their cause of action against Campbell. These findings clearly warranted the judgment rendered; however, appellants have presented several assignments of error challenging the judgment in favor of both Railway and Campbell, which, if sustained in whole or in part, would call for a reversal of this case. Railway has presented a cross-assignment of error, challenging the ruling of the court on its motion for peremptory instruction, which, if sustained, will obviate the necessity of discussing appellants' assignments of error against the Railway, hence this cross-assignment will be the first considered.

This cross-assignment is: "The trial court committed material error in failing and refusing to grant defendant's motion for an instructed verdict, which was duly and timely requested." Under this assign-

ment, three propositions are presented. These propositions are based upon the theory that the narrow strip of land on which the pier supporting the bridge over the public road was its private property and its use for road purposes was never surrendered to the county; that the pier was constructed under plans and specifications approved by the commissioners' court of Dallas county, for which reason Railway cannot be held guilty of negligence in the manner the pier was constructed; that as the V-shaped noseguard at each end of the pier was not constructed by Railway as a part of the pier, but was constructed by the county after Railway had completed its construction of the bridge over the crossing, and, that as the undisputed evidence showed that the ends of the pier were plainly marked by black and white diagonal stripes upon boards nailed upon the tiling of the pier, and that as the undisputed evidence shows that said pier and the bridge construction were visible for day time travel approaching the bridge from the west, for a distance of 600 feet, and by night for a distance of 450 feet, Railway, as a matter of law, was not guilty of any negligence, either in the manner of the construction of the bridge and pier, or in a failure to place any warning lights. We cannot agree to this contention.

■ While it is true that the crossing, including the pier in question, was constructed according to plans and specifications approved by the county, such approval does not exempt the Railway from the exercise of ordinary care to construct either a grade crossing, or an overhead crossing, so that the traveling public may use the crossing with reasonable safety. Articles 6320 and 6327, R.C.S.1925; Galveston, H. & S. A. Ry. Co. v. Rodriguez (Tex.Com. App.) 288 S.W. 151; Hays et al. v. Texarkana & Fort Smith R. Co. (Tex.Civ.App.) 87 S.W.(2d) 1106.

■ Jefferson Road Extension was a public road before Railway built its tracks across it, notwithstanding Dallas county's use of the small strip of land owned by Railway was not obtained from the Railway, either by contract or by condemnation proceedings. Railway could not destroy the road because of this fact, but it could compel the county to remunerate it for its statutory damages in taking possession of, and using, its land without first obtaining the right to do so. Railway could enforce its right of remuneration from the county.

Railway's duty to construct and maintain the highway crossing in a condition of reasonable safety to the traveling public was a duty it could not delegate to the county, and the fact that the county agreed to the construction in no way relieved Railway of its duty to the traveling public. We believe all of the affirmative issues of negligence of Railway, in respect to the construction and maintenance of the crossing, submitted by the court, was raised by the evidence. It was for the jury to find whether the pier, separating the two roadways under the crossing, was negligently constructed, in view of the fact of its unusual width of 6 feet and 8 inches, and in view of the further fact of the construction at each end of the pier of the V-shaped concrete noseguard; and also whether it was negligence to maintain a crossing in this condition without warning lights on the end of the pier. While the county constructed the said V-shaped noseguard, but, it being a part of the crossing construction, and the statutory duty resting on Railway to maintain it with reasonable safety to the public, Railway is responsible for the entire condition of the crossing.

■ Did the court err in overruling the special exception of appellants, to that portion of Railway's pleadings which pleaded the two contracts entered into between Railway and Dallas county for the construction of the overhead crossing in question? These two contracts, one being supplemental to the other, showing the agreement by which Dallas county compensated Railway for its use of the land for road purposes, and the agreements under which the pier was built, we believe were admissible for this purpose. Paragraph 6 of the contract, the paragraph that bound the county to indemnify Railway for damages by reason of the said construction, was held by the trial court to be void and not binding on the county, and the special exception as to this part of the contract should have been sustained; but in view of the action of the court in taking such paragraph from the consideration of the jury by a proper charge, the action of the court in overruling the special exception in its entirety became harmless.

As we read that portion of the record relating to the admission of the contracts in evidence, counsel for appellants agreed that the contracts might be read, provided the court charged the jury not to consider paragraph 6, and this the court did. So, this

assignment of error is overruled, as is also the assignment of error in respect to the admission of the contracts in evidence under the restrictive charge of the court.

 Appellants contend that the statutes of this state, which forbid the obstruction of a public roadway, were violated by Railway in its construction of the pier in question. The pier unquestionably occupied, to the exclusion of the traveling public, a strip of land between the two roadways that passed under the railroad, 6 feet and 8 inches wide and 18 feet long. There remained after this construction a roadway 20 feet wide on each side of the pier. Appellants' contention in respect to this is, that in placing the said obstruction in the roadway, Railway was guilty of negligence as a matter of law. If such obstruction comes within the terms of the statute forbidding obstruction of a public roadway, then appellants are correct. Article 784 of the Revised Penal Code reads: "Whoever shall wilfully obstruct or injure or cause to be obstructed or injured in any manner whatsoever any public road or highway, * * * within this State, shall be fined not exceeding two hundred dollars.".

We do not believe the construction of the pier in question is in violation of the terms of the above-quoted statute. After the construction of the pier, there remained 40 feet of paved highway, 20 feet on each side of the pier, for the use of the public. The taking by Dallas county of the strip of land belonging to the Railway, without having compensated Railway for the land taken, was in violation of the Constitution, and hence a wrongful taking. Dallas county must settle with Railway for this wrongful appropriation of its land. This fact was recognized by the county and it entered into negotiations with Railway for the purpose of adjusting with Railway the damage it was clearly entitled to. An agreement was finally reached, evidenced by the two contracts, by means of which Dallas county secured the right to use, for the purpose of this crossing, a strip of land 46 feet wide on the condition, among others, that railway should have the right to use the strip of land through the center of the said 46-foot strip for the purpose of erecting the pier in question, the plans of which were approved by Dallas county. The erection of this pier did not block the roadway to be constructed, for there would remain an unblocked roadway 20 feet wide to be used exclusively by western bound traffic,

and an unblocked roadway 20 feet wide to be used exclusively by eastern bound traffic. It appears that the county, as it had a right to do, was demanding from Railway the construction of an overhead crossing, and it secured such crossing by the means above stated. It is common knowledge that such a crossing over a public road is much safer for traffic than a grade crossing. It does not require argument or citation of authority to show that the commissioners court of Dallas county had the power to permit the construction of the pier herein described, for the purpose of the overhead crossing. It necessarily follows that the construction of the pier under the circumstances of this case does not constitute the blocking of a public road within the meaning of said article 784 of the Penal Code.

The jury having resolved all issues of negligence raised by the pleadings and evidence and submitted by the court in favor of Railway, it necessarily follows that the case, as between appellants and Railway, must be affirmed.

 Did the court err in refusing appellants' motion for a new trial in their suit against Campbell? The findings of the jury on the various issues submitted on appellants' right to recover against Campbell warrant the judgment entered in his favor. However, appellants assign error on the ruling of the court, which, if sustained in whole or in part, would render a reversal necessary. Such assignments as are considered material to the disposition of this appeal will be discussed. The 42nd Legislature, in 1931, enacted article 6701b, R.C.S. (Vernon's Ann. Civ.St. art. 6701b), commonly known as the "automobile guest" statute. This article reads:

"Sec. 1. No person transported over the public highways of this State by the owner or operator of a motor vehicle as his guest without payment for such transportation, shall have a cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator, or caused by his heedlessness or his reckless disregard of the rights of others.

"Sec. 2. This Act shall not relieve a public carrier or any owner or operator of a motor vehicle while the same is being demonstrated to a prospective purchaser, of responsibility for any injuries sustained by

a passenger being transported by such public carrier, or by such owner or operator."

The undisputed evidence shows that deceased was a guest passenger in Campbell's automobile, within the provisions of this statute, at the time of the fatal accident. If this statute is valid, appellants' right to recover against Campbell is controlled by this statute, and the trial court submitted the issues as to appellants' right of recovery against Campbell, under the provisions of this statute. All submitted issues were found in favor of Campbell. In addition to such issues, the court also submitted issues of ordinary negligence on the part of Campbell, and these issues were in the main found in favor of appellants, but the court did not base the judgment on findings as to ordinary negligence, because of this statute.

The constitutionality of this statute is assailed by appellants on the ground that it is in violation of section 26, article 16, of our State Constitution. If this be true, the "automobile guest" statute must fall. The constitutional provision invoked is section 26 of article 16, and reads:

"Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide."

Our Supreme Court, in the case of Morton Salt Co. v. Wells, 123 Tex. 151, 70 S. W.(2d) 409, 410, said of this constitutional provision that, "The cause of action here asserted [death through gross negligence] is one given by the Constitution, and the Legislature was without power to add to or take from the conditions under which, by virtue of the Constitution, it could be maintained, nor did it attempt to do so." If the cause of action allowed by article 6701b so narrows the right to recover against the owner or operator of an automobile as to exclude a right that is given in said constitutional provision, then at least to the extent of such denial the statute is unconstitutional. The Constitution gives the right of recovery of exemplary damages, if a death results from the "gross neglect" of a person responsible for such death. It is contended by appellants that the statute in question excludes "gross neglect" as a

ground of recovery. It is true that the statute does not use the term "gross neglect" or "gross negligence," but it does use terms that embrace approved definitions of "gross negligence." Napier v. Mooneyham et al. (Tex.Civ.App.) 94 S.W.(2d) 564; Aycock v. Green (Tex.Civ.App.) 94 S.W.(2d) 894. The evident intent of the Legislature, in enacting the "automobile guest" statute, was to exclude recovery for ordinary negligence. The term "gross neglect" used in the said section of the Constitution means without the exercise of any care. The term "heedlessness" used in the statute means also without the exercise of any care, and is synonymous with "gross neglect." It is claimed also that there is no cause of action in the statute to correspond to the right given in the Constitution for the death of one caused "through the willful act or omission" of another. It is true these exact words are not used in the statute, but they find their equivalent in the said statute, which allows a recovery for death through his "reckless disregard for the rights of others." An intentional act which causes death is a willful act, a "reckless disregard for the rights of others," may be either a willful omission or a willful act. It reasonably appears, therefore, that the cause of action given by the statute is the same cause of action guaranteed by the Constitution.

Error is assigned to the admission of a letter written three days after the accident to the mother of Campbell, by appellant Mrs. Alecia Paschall. The letter reads:

"Dear Mrs. Campbell: I wanted to see you yesterday when Grover told me you were coming to Dallas, but it just seemed impossible. I cannot express myself in the way I would like to do, but I want you to know that what I am going to say is written sincerely from the heart. As bad as it may sound, I want you to know that if Gene had to die and pass on as he did, I am so glad that Grover was the one to be with him. After the first shock, not only of his death but the manner in which he went, I was so thankful that the man who was Gene's closest friend was with him. I don't suppose that any one of Gene's numerous friends were anywhere as near to him as Grover has always been. We all have known him, and the children often talk of him. He is more like one of the family than anyone else. So, I want you to know that none of us hold Grover responsible or in any way condemn him. If I am not con-

vinced that you all feel as I do, it will be impossible for me to ask Grover's advice and counsel on the many perplexing problems that confront me.

"As one mother to another, let me say that our children mean more .to us than anything. I know from the tender solicity of my oldest boy has shown me how Grover must feel about you. After all, we women are able to bear so much more than the men. So let's get him well and restore to him his peace of mind. Please believe that if there is any way at any time I can serve you I would count it a great favor. Affectionately, Alecia Paschall."

At the time the letter was written, Mrs. Paschall knew nothing of the facts attending the death of her husband. She was in the city of Corpus Christi when the death occurred, and came home with her children on receipt of the news of the fatal accident. She had read no newspaper account of the accident, nor had she been told of any of the particulars attending it. When this letter was written, she knew Campbell and her husband were connected in the same business and were very close personal friends. She was stricken with grief because of the death of her husband, and in such mental condition wrote the letter. We think the court erred in permitting this letter to be read to the jury, and especially in permitting the reading of this expression, "So I want you to know that none of us hold Grover (Campbell) responsible or in any way condemn him." Under the circumstances, this expression of exoneration of Campbell could not be binding on Mrs. Paschall, because it is not shown that she wrote such letter of exoneration while in full possession of all the facts. Long v. Moore, 19 Tex.Civ.App. 363, 48 S.W. 43; Trice v. Bridgewater, 125 Tex. 75, 81 S.W. (2d) 63, 100 A.L.R. 1014; Ebert v. Gulf, C. & S. F. Ry. Co. (Tex.Civ.App.) 49 S.W. 1105.

The admission of this letter was also properly objected to by the minor children, because it was hearsay and not binding on them. This objection was overruled. If Mrs. Paschall had been acquainted with the facts and from such facts believed that Campbell should have been exonerated for any wrongful act, such belief on her part could not bind the minor children, who are, respectively, 12, 9, and 7 years of age, and they had the right to have their interests protected from the effect of such an admission on their mother's part. Wigmore on

Evidence (2d Ed.) § 1076, p. 582; Gersdorff v. Torres (Tex.Com.App.) 293 S.W. 560, 561; Williams v. Fuerstenberg (Tex.Civ. App.) 12 S.W.(2d) 812.

The error as against Mrs. Paschall may have been rendered harmless by reason of the fact that Campbell, while on the witness stand, stated without objection in effect that Mrs. Paschall told him that she did not blame him for the death of her husband; but this in no way could affect the error as against the minor children. We hold that it was reversible error, at least against the minor children, to admit this letter in evidence.

Appellants assign error because an argument made to the jury by the attorney for Campbell, in which argument the attorney made the statement that, if the jury answered certain special issues, to the effect that Campbell was guilty of negligence and that such negligence was the sole proximate cause of the injury, that such answers would let the railroad out. This argument was objected to at the time by counsel for appellants, on the ground that it was improper for counsel to inform the jury as to the legal effect of their answers. The trial court sustained such objection, but it is claimed in the bill of exceptions and urged by appellants on this appeal that such argument was highly prejudicial and that the harmful effect thereof was not cured by sustaining plaintiffs' objection thereto. The bill of exceptions setting out the argument is not qualified by the court. Counsel who made the argument charges in his brief that it should have been modified in some particulars. This, of course, we cannot consider, but must accept as a fact the statement in reference thereto in the bill of exceptions. It is the settled rule of law in this state that an argument by counsel to the jury as to the effect of their answers to special issues is improper. McFaddin v. Hebert, 118 Tex. 314, 15 S.W. (2d) 213; Fidelity Union Cas. Co. v. Carey (Tex.Com.App.) 25 S.W.(2d) 302; Texas Emp. Ins. Ass'n v. Phillips (Tex.Civ.App.) 62 S.W.(2d) 313. The harmful effect of this argument was not cured by the court's sustaining appellants' objection thereto. Counsel solemnly informed the jury that, if the answers made to the said special issues were a finding that Campbell was guilty of negligence in the respects submitted, and that such negligence was the sole proximate cause of the injuries, then such answers "would let the railroad out." The effect

of this statement could not be taken away from the jury by the court. Improper argument is reversible error, unless it can be said from the entire record the error is harmless. This conclusion cannot be drawn from the record of this case. We therefore hold that the argument is reversible error.

It is urged by appellants that the trial court committed reversible error in refusing to grant appellants' motion for a new trial, because of alleged misconduct of the jury. This assignment of error applies to Railway and to Campbell alike, and, if sustained, calls for a reversal of the judgment in its entirety. The misconduct alleged is that, after the jury had retired to its room, and before it had answered all of the issues submitted in respect to appellants' case against Railway, and before it had answered any of the issues in respect to the case against Campbell, the jury agreed that it would exonerate both Railway and Campbell of any negligence, and would answer all of the issues so as to effectuate this purpose.

There is evidence of several jurors to the effect that when the jury retired the foreman read the entire charge to the jury, and then the jury began their consideration of special issue No. 1; that there was considerable argument in reference to how such issue should be answered; that at first the jury stood seven to five in favor of the answer finally made; that when question No. 3 was considered there ·was considerable argument again, with about the same division as on the first issue, and that before this issue was answered the jury agreed to determine whether either of the defendants should be held guilty of negligence, or whether they should make findings that would deny appellants a recovery, and after considerable discussion it was agreed that they would find neither party guilty of negligence, deny any recovery to appellants, and that the foreman should write the answers so as to effectuate this result.

On the other hand, there was evidence from two or three jurors, to the effect that all of the questions had been answered, except the question in reference to the amount of damages that should be assessed, and that the argument was that, as the effect of their answers on all the other issues was to exonerate both parties from negligence, they would find no damages; and one juror at least denied that any such discussion

was had, although it appears that this juror had made to counsel for appellants a contrary statement.

██ If a jury agrees, before it has considered and answered the special issues, that such issues shall be answered in a manner to reflect a certain result and, without considering the issues separately, the foreman is directed to write the answers in such a manner as to effectuate such ˙result, this is misconduct on the part of the jury, for the reason that the whole theory and púrpose of the special issues law is set aside by such action of the jury.

██ If, however, after a jury has answered the special issues submitted by the court, that form the basis of the court's judgment, shall have then considered the effect of their answers and subsequently made no change in the answers to any special issue forming a basis for the judgment, there is no culpable misconduct, for no one has been thereby injured, and the spirit of the special issue law has not been violated.

██ The above statement of the evidence on the issues of misconduct of the jury clearly presents an issue of fact, to be determined by the trial court, and such determination is just as binding on this court as is any other controverted issue of fact, determined either by a jury verdict or by the finding of the court. As there was substantial evidence sustaining the implied finding of fact by the trial court, when the motion for a new trial was overruled on the ground of misconduct, this court must accept such finding as a final disposition of such issue.

There was raised another issue of misconduct of the jury. It was alleged in the motion for a new trial that one juror brought before the jury evidence of other piers separating overhead crossings on two other public roads in Dallas county. There is evidence which warrants the court in finding that no misconduct existed in this respect, for which reason this contention is overruled.

There are numerous other assignments of error, which we do not believe present reversible error, nor do we believe they are of such importance that they call for a discussion, hence they are overruled without discussion.

It necessarily follows that, in our opinion, the judgment in so far as it affects Railway should be affirmed, and that in so far as it

affects Campbell, should be reversed and remanded, and it is so ordered.

Affirmed in part; reversed and remanded in part.

Motion for Rehearing.

In the original opinion in this case, we stated in effect that no issue was submitted on Railway's cross-action against its codefendant Campbell, and Railway, in its motion for rehearing, calls our attention to the fact that among the special issues submitted to the jury by the trial court was a submission of issues raised by Railway's cross-action against Campbell. After a closer examination of these issues, we are of the opinion that they were in response to Railway's said cross-action and we correct the said statement made in the original opinion. However, this error is immaterial, because of the findings of the jury in favor of Railway on the issues between it and appellants. In all other respects, Railway's motion for rehearing is overruled.

We have carefully considered both appellants' and Campbell's respective motions for rehearing, and they are overruled.

Motions overruled.