**James Leo HUTH, Plaintiff-Appellee,**

**v.**

**SOUTHERN PACIFIC COMPANY,**
**Defendant-Appellant.**

**No. 27439**
**Summary Calendar.**

United States Court of Appeals
Fifth Circuit.

Oct. 7, 1969.

Fred B. Wagner Brownsville, Tex., John F. Heard, Baker, Botts, Shepherd & Coates, Houston, Tex., for Southern Pacific Co.

Thomas G. Sharpe, Jr., Hardy & Sharpe, Brownsville, Tex., for plaintiff-appellee.

James Leo Huth, in pro per.

Before JOHN R. BROWN, Chief Judge, THORNBERRY and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The sole question in this diversity case is whether a private contract between the Texas Highway Department and the Railroad[1] imposing on the Highway Department the duty to maintain the Railroad's right of way over a public highway crossing has the effect of absolving the Railroad from damages sustained by a member of the public as a consequence of a condition resulting from improper maintenance. On a jury verdict on special interrogatories[2] finding that the Railroad had a 50-foot right of way which it failed properly to maintain and that such negligence caused Huth's injuries, the Trial Court entered judgment against the Railroad. We agree and affirm.

## I.

■ Before getting to the merits, it is appropriate to make a few brief comments about the method used to dispose of this appeal. This is done to acquaint the Bar of this Court, the Federal Judiciary across the nation, scholars and others interested in judicial administration with the continued operation of the process of judicial screening of cases before calendaring. Essentially it is to update our experience since the full discussion of the procedure in Murphy v. Houma Well Service, 5 Cir., 1969, 409 F.2d 804, Part I.

As there outlined, the system works this way. Every case upon the filing of the last brief (or expiration of time in which to file briefs) is referred to one of four standing panels composed of Judges in active service of the Fifth Circuit. The case is judicially screened by Judges. This results in a classification as one of four categories. Class III is for limited oral argument (15 minutes) with notice to the Bar on the face of the printed Court calendar.[3] Class IV is for full argument allowed under FRAP (30 minutes). Class II, as the Court denominates them in its daily operations, covers those cases in which the Court has determined that the case is of such a character as not to justify oral argument. On the Court making such determination, the parties are notified in writing that the case has been put on the Summary Calendar. See Fifth Circuit Rule 18, Appendix, Murphy, supra, at 812. Class I, now small in numbers, covers frivolous cases. The parties are notified that the case is on the Summary Calendar prior to the time any opinion is filed.

■ As we pointed out in Murphy, supra 409 F.2d at 806, for a case to go on the Summary Calendar there must be unanimous action of the panel members, and in disposing of it, the decision must likewise be unanimous.

The experience of the Court has been both informative and productive. The figures covering the first six months of 1969 (January-June) plus the few days in 1968 (December 13-31, 1968) are revealing. Although it is too early to tell for a certainty the extent to which

---

1. Southern Pacific Co.

2. For their utility in excising critical fact-legal questions to permit decisive appellate action see Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338 (1967). This is reported as a portion of the Proceedings of the Annual Judicial Conference of the Tenth Judicial Circuit of the United States, 44 F.R.D. 245–353 (1967).

3. See Note 7, Murphy, supra.

the Summary Calendar practice enhances the productivity of Judges and the Court, the fact is that in the fiscal year just closed, during the last six months of which we had the Summary Calendar, our output was markedly increased and more than kept up with our ever expanding increase of input.[4]

In the judicial screening process itself, the number of Summary II cases has steadily increased [5] to an overall adjusted basis of approximately 32.7%, and the judicial classification both in percentages [6] and numbers [7] continues with evenhandedness across the full spectrum of our varied, but continuously growing, docket. And the experience since July 1, 1969, indicates that this rate will be maintained, if not increased.[8]

4. The comparison between FY 1968 and FY 1969 reveals:

|  | F.Y. 1968 | F.Y. 1969 | Net change |
|---|---|---|---|
| Cases closed | 1290 | 1496 | +206 |
| New filings | 1347 | 1489 | +142 |
| Undisposed of cases | 1079 | 1069 | —7 |
| Percent of carry-over of unassigned cases to total annual filing | 56.0% | 50.6% | —5.4% |

All of this was accomplished with reduction in actual available judge power (from 13 to 12) and with a notable reduction of approximately 10 weeks in regularly scheduled sessions of court weeks during January-June 1969.

5. The Report covering December 13–June 30, 1969, shows:

| Cases Classified by Judges | I | II | III | IV | Total |
|---|---|---|---|---|---|
|  |  |  | Total Classified As |  |  |
| 667 | 2 | 216 | 265 | 184 | 667 |

The overall adjusted percentage of Class II to the total cases screened was 32.7%.

6. By percentage the breakdown of the Summary II cases is as follows:

| Habeas Corpus and § 2255 | 25.7% |
|---|---|
| Direct criminal appeals | 26.8% |
| Civil appeals | 47.5% |
|  | 100% |

7.

| Subject Matter | Number of Class II cases |
|---|---|
| Direct criminal | 58 |
| Habeas corpus | 38 |
| § 2255 | 17 |
| Civil: |  |
|   Private Civil | 53 |
|   U.S. Civil | 20 |
|   Tax | 5 |
|   Bankruptcy | 5 |
|   NLRB | 10 |
|   Civil Rights | 4 |
|   Admiralty | 6 |
| Total | 216 |

8. Subject to some slight adjustment, the totals (Dec. 13, 1968–Sept. 9, 1969) are as follows:

| Cases Classified by Judges | I | II | III | IV | Total |
|---|---|---|---|---|---|
|  |  |  | Total Classified As |  |  |
| 857 | 3 | 289 | 338 | 227 | 857 |

During the period July 1, 1969–Sept. 9, 1969, the percentage of Class II to the total cases screened was 38.9%. At this rate approximately 60 to 65% of the cases will be calendared for oral argument.

The utility of the screening process and the Summary II classification is not limited to increasing output to match or overcome continuous growth in input. Another substantial virtue—especially in these days and times of great public concern about the length of time it takes for a case to get tried in a trial court until the appellate process is finally wound up—is expedition in actual disposition. There is no time lag at all from the time the last brief is filed (or the time for filing expired) until the case is assigned to a panel. The case goes immediately to the panel in regular routine. Likewise, there is no time lag between that date and the time it would ordinarily go on a printed calendar for argument. And there has been a marked reduction in the time from the moment the last brief is filed until the Court's opinion is filed and released. The reduction in time for transmission of the case to a panel has been reduced by almost 300%. In final output, the time from filing of the last briefs until final decision has been reduced nearly 50%.[9] And opinions come out continuously in large number whether the Court is holding sessions or not.[10]

Not only has the procedure demonstrated its administrative utility, but, more important, our experience in a judicial technique never before tried in such depth or width has given us a feeling of confidence in the trustworthiness of the system in achieving the goals of our cherished Anglo-American adversary case-and-controversy system. Every step in the process calls for judicial selectivity—judicial selectivity in the light of arguments pro and con made on behalf of the parties under the full briefing assured by FRAP.

In this process of discriminating selectivity, the Court, in its continuing self-education from cumulative experience in the shaping of this new judicial tool, strives to meet both the literal demands and, more important, the underlying spirit of F.C.C. v. WJR, The Goodwill Station, Inc., 1949, 337 U.S. 265, 274–277, 69 S.Ct. 1097, 1103–1104, 93 L.Ed. 1353, 1360–1361.

There the Court, rejecting the Court of Appeals' holding that oral argument is required to satisfy the Constitution, said, "Taken at its literal and explicit import, the Court's broad constitutional ruling cannot be sustained." Any such conclusion, the Court went on, "would require oral argument upon every question of law * * * regardless of whether the legal question were substantial or insubstantial; of the substantive nature of the asserted right or interest involved; of whether Congress had provided a procedure, relating to the particular interest, requiring oral agument or allowing it to be dispensed with * * *." And then declining to explore the administrative consequences of any such holding, the Court declared,

9. Based on the Table B–4, Report of the Director of the Administrative Office and converting the figures from months to days, the figures as to median times are as follows:

|  | Class II | A.O. Dir. Rpt. FY 1968 (5th Cir.) | Time Saved by Class II |
|---|---|---|---|
| Median Time from Last Brief to Date of Opinion ....... | 68 | 126 | 58 |
| Median Time from Last Brief to Date Transmitted to Full Panel .................... | 22 | 81 | 59 |

10. During Dec. 13, 1968–June 30, 1969 opinions published in Class II cases were:

| Signed opinions | 41 |
|---|---|
| Per Curiams | 109 |
| Total | 150 |

"It is enough to say that due process of law, as conceived by the Fifth Amendment, has never been cast in so rigid and all-inclusive confinement."

The Court then proceeded to emphasize the discriminating nature of the problem. "On the contrary, due process of law has never been a term of fixed and invariable content. This is as true with reference to oral argument as with respect to other elements of procedural due process. For this Court has held in some situations that such argument is essential to a fair hearing, Londoner v. Denver, 210 U.S. 373, [28 S.Ct. 708], 52 L.Ed. 1103, in others that argument submitted in writing is sufficient. Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 911, 80 L.Ed. 1288 [1295]. See also Johnson & Wimsatt v. Hazen, 69 App.D.C. 151, 99 F.2d 384; Mitchell v. Reichelderfer, 61 App.D.C. 50, 57 F.2d 416."

It then characterized the Court of Appeals' holding as "in conflict" with its rulings "that the right of oral argument as a matter of procedural due process varies from case to case in accordance with differing circumstances, as do other procedural regulations. Certainly the Constitution does not require oral argument in all cases where only insubstantial or frivolous questions of law, *or indeed even substantial ones,* are raised." (Emphasis supplied).

The Court warned against undertaking to "generalize more broadly than the particular circumstances require upon when and under what circumstances procedural due process may require oral argument." That is not a matter for indiscriminate application. "It is rather one for case-to-case determination, through which alone account may be taken of differences in the particular interests affected, circumstances involved, and procedures prescribed by Congress for dealing with them." F. C. C. v. WJR, *supra,* at 337 U.S. 274–277, 69 S.Ct. 1103–1104, 93 L.Ed. 1360–1361.

Every step on the way is a delicate judicial judgment. In approximately 63% of the cases (see notes 5 and 8, *supra*) the Court judicially determines that from the nature of the case, its class, its complexities, the public significance of the issues, or a variety of other factors, the case calls for oral argument, either limited or full. For the remaining 37% the same judicial judgment for *each* case is that oral argument is not required. The care with which that critical judgment is exercised is magnified by the system's requirement for a double unanimity—(1) at the time of classification as a Summary II and (2) in the decision.[11]

Obviously this Court, made up of ex-lawyers seasoned by courtroom combat, must be the first to recognize that in making this delicate case-by-case judgment for or against oral argument it can—as in every other type of ruling—make an error. Happily, under our system the Court rests easier since any such error, or the claim of one, is open to review. And the fact that 60 to 65% of the cases are calendared for oral argument attests to our conviction that oral argument is at times required. The differences arise with respect to a particular case, and the rule of dual unanimity and automatic reclassification affords in our judgment additional insulation against making such errors.

## II.

■ On the merits we need not labor the facts. The special contract came from a mutually agreeable exchange of right-of-way easements according the

11. Reclassification from Summary II to Class III or IV runs about 10%:

|  | Dec. 13, 1968– June 30, 1969 | July 1– Sept. 9, '69 | Total |
|---|---|---|---|
| Reclassified from Summary II | 21 | 10 | 31 |
| Remaining Final Summary II | 216 | 73 | 289 |

Railroad a 50-foot right of way over the crossing. The trouble came from oil which the jury could find was on both the Highway Department's and the Railroad's rights of way.[12]

What—and all—this case is about is the significance of the contract.[13] Its significance is not in terms of its effectiveness between the State and the Railroad. Rather it is in terms of whether, *vis-a-vis* a member of the public, this exonerates the Railroad from the consequences of its own carelessness.

In a way the Railroad's hopeful escape from the expected consequences of its own misactions is a sort of scriptural paraphrase: What the State gives [imposes] the State may take away [relinquish].

This analysis starts from the position that the State has statutorily imposed upon the railroads in Texas a duty to maintain their rights of way in proper condition.[14]

In perhaps a man-bites-dog approach the Railroad, as a member of an industrial class that might ordinarily minimize the operative significance of statutory obligations, here maximizes them to the utmost. On this basis it then

---

12. The Railroad cannot submerge its misplaced hope that we would or could under the Seventh Amendment reconsider the facts. On the questions of physical and legal causation there was quite enough to sustain the jury findings of negligence attributable to the Railroad.

13. The contract provides:
"The State assumes the entire responsibility for the construction, maintenance and use of said highway upon the railroad company's property at the location herein described; and nothing contained herein shall ever be construed to place upon the railroad company any manner of liability for injury to or death of persons, or for damage to or loss of property, arising from or in any manner connected with the construction, maintenance or use of the portion of said highway located upon the railroad company's said property."

14. Art. 1151 of Vernon's Annotated Civil Statutes states:
"Every railroad company in this State shall place and keep that portion of its roadbed and right of way over or across which any public street of any incorporated town or village may run, in proper condition for the use of the traveling public; and in case of its failure to do so for thirty days after written notice given to the section boss of the section where such work or repairs are needed, by the town marshal of such town or village, it shall be liable to a penalty of twenty-five dollars for each week such railroad may fail or neglect to comply with the requirements of this article, recoverable in any court having jurisdiction of the amount involved, in a suit in the name of such town or village."

Vernon's Civ.Stats.Ann. Art. 1151 (1963).
Art. 6327 states:
"Every railroad company in this State shall place and keep that portion of its roadbed and right of way, over or across which any public county road may run, in proper condition for the use of the traveling public, and in case of its failure to do so for thirty days after written notice given to the section boss of the section where such work or repairs are needed by the overseer of such public road, it shall be liable to a penalty of ten dollars for each week such railroad company may fail or neglect to comply with the requirements of this article. Such penalty shall go to the road and bridge fund of the county in which the suit is brought; and the county attorney, upon the making of an affidavit of the facts by any person, shall at once institute against the company violating any provision of this article suit in the proper court to recover such penalty or penalties, and his wilful failure or refusal to do so shall be sufficient cause for his removal from office, unless it is evident that such suit could not have been maintained. The proceedings under this article shall be conducted in the same manner as civil suits. The county attorney attending to such suits shall be entitled to a fee in each case of ten dollars, to be taxed as costs; provided, that when two or more penalties are sought to be recovered in the same suit, but one such fee shall be allowed. Such suits shall be conducted in the name of the county, and if the county be cast in the suit no costs shall be charged against it."
Vernon's Civ.Stats.Ann. Art. 6327 (1926).

argues that the State, having made its demands on railroads so peremptory, was quite conscious of this in its undertaking to assume these heavy burdens.

But the problem is not in terms of the contract, its enforceability as between Railroad and State, or the interpretation of it as applying to this occurrence. The question is not whether the words of the contract operate to shift the duty of maintenance but is whether the Railroads' statutory duty to keep its crossings and adjacent rights of way in proper condition is capable of being shifted to the State by mere contract.

■ The only new twist is whether it matters that the State is the one taking on these duties, for in Texas it is clear that a railroad cannot by contract shift this duty to an entity other than the State. See Paschall v. Gulf, C. & S. F. Ry., Tex.Civ.App., 1936, 100 S.W.2d 183; Gulf, C. & S. F. Ry. v. Woods, Tex.Civ. App., 1924, 262 S.W. 229 (a contract to shift the duty to a county is without consideration).

■ The Railroad argues, however, that a contract with the State presents a special situation. It says that the duty of maintenance of all public roads including railroad crossings and rights of way originally rested with the State, that the State delegated this duty to the railway companies, and that the State can reclaim, and here has reclaimed, the duty.

The Railroad argues that such reclamation has been judicially sanctioned and points to Hale v. City of Dallas, Tex. Civ.App., 1969, 335 S.W.2d 785 (error ref'd n. r. e.), as authority for this proposition.

In *Hale* the City of Dallas was sued for negligent maintenance of a public street within the city limits on the theory that the City had breached a statutorily imposed duty. The Trial Court granted the City's motion for summary judgment, and the Court of Civil Appeals affirmed on the ground that the City's duty of maintenance had been reclaimed contractually by the State. The Court recognized the obvious—that the State originally had absolute control over the thoroughfares of Texas cities and that since the cities acquired control over their streets only by grant of the State Legislature, what the State had granted it could take back.

But this was not a situation in which Texas Courts, concerned for the safety of Texas citizens (or visiting travellers), were even for the moment about to allow two parties to shift responsibility in, around and among as many participants as could be found. As *Hale* recognizes, this was a case of the State—aware of all the complex problems of construction, maintenance, and operation of the growing network of State highways through cities—calling for legislative and administrative adjustment. A statute was enacted to permit just such contracts.[15]

It is true, as the Railroad contends, that *Hale* stands for the proposition that within the hierarchy of State agencies the State can reclaim a duty that it imposed on one of its subordinate constituents. But it does not mean that this may be done by *contract* alone. The contract in *Hale* was, of course, important for it was the contract which manifested the purpose of the parties to take advantage of the legislative grant of power to shift responsibilities. But the contract was effective as to nonparties only by reason of the empowering statute.

15. Art. 6673–b provides:
    "The State Highway Commission is hereby authorized and empowered, in its discretion, to enter into contracts or agreements with the governing bodies of incorporated cities * * * providing for the location, relocation, construction, reconstruction, maintenance, control, supervision, and regulation of designated State highways within or through the corporate limits * * *."
    Vernon's Civ.Stats.Ann. Art. 6673–b (1969).

Here the Railroad neither has—nor likely hopes ever to get—a legislative absolution for its right-of-way sins.[16]

Affirmed.

---

16. We examine only the relationship of the Railroad and members of the public. We assume, without deciding, that the contract is fully effective as between the Railroad and the State even though enforcement of the contract might impose difficulties since Texas still clings to sovereign immunity.