423 F.2d 1028
 UNITED STATES of America for the Use and Benefit of LIGHT &
POWER UTILITIES CORPORATION, Plaintiff-Appellee,
v.
L. B. SAMFORD, INCORPORATED, et al., Defendants-Third Party
Plaintiffs-Appellants, v. SOUTHEASTERN ELECTRICAL
ENTERPRISE, INC., Third-Party Defendant.
 No. 28489 Summary Calendar.
 United States Court of Appeals, Fifth Circuit.
 April 1, 1970.
 
 D. Lloyd Zook, Moore, Welbaum, Zook & Jones, Miami, Fla., for defendants-third-party plaintiffs-appellants.
 Arnold D. Levine, Tampa, Fla., for plaintiff-appellee.
 Before JOHN R. BROWN, Chief Judge, and MORGAN and CLARK, Circuit judges.
 PER CURIAM.
 
 
 1
 This is a Miller Act[1] case arising out of a construction contract for buildings at MacDill Air Force Base in Tampa, Florida for the United States.[2] L. B. Samford, Inc. is the general contractor-defendant, Fidelity and Casualty Co. of New York is its surety-defendant.[3] In 1965 Samford entered into an electrical subcontract with Southeastern Electrical Enterprise, Inc., third-party defendant, which, in turn, entered into a contract with Light and Power Utilities, Corp., the plaintiff, to provide materials, naming Electric Supply Company of Tampa as distributor.
 
 
 2
 The only problem presented by the appeal, in a case which lacks even an ounce of equity since it is undisputed that the general contractor received the materials, incorporated them into the project and received payment for them in the government bid price, is whether the 'supplier' to the subcontractor was L & P or Electric Supply, the distributor. Our answer is that the Trial Court was entitled to find that L & P was the supplier. We affirm.
 
 
 3
 The problem arises because of the terms of 270b.[4] Its background, purpose and interpretation are set forth in MacEvoy,[5] the leading case on the subject.
 
 
 4
 The Trial Court held extended hearings in which the Judge was reminded, re-reminded, and then re-re-reminded of the question. On ample facts the Judge found that L & P was the supplier. That there were markers pointing in an opposite direction did not compel a contrary conclusion. There was more than ample evidence to pass muster under F.R.Civ.P. 52(a), as shown by the detailed findings and conclusions.
 
 
 5
 L & P had a practice of using local distributors. It would not 'deal' directly with contractors. The local distributor was presumably to service the job, and in the first instance it was to remit to the manufacturer the amounts called for on shipping orders. But it had little else to do. It was L & P, through its manufacturer's agent, that negotiated and arrived at the material contract with Southeastern. These two decided on the fixtures and price and included a 'handling charge' for the as yet unnamed distributor. Electric Supply was not a party to the contract negotiations. When the time came for Southeastern to use the fixtures, L & P shipped them directly to the job site. None of the fixtures was ever handled by Electric Supply, and none was in Electric Supply's inventory.
 
 
 6
 Samford was kept aware of L & P's position as supplier by means of specification sheets identifying the materials L & P intended to deliver, which were submitted by L & P to Southeastern to Samford and ultimately to the Corps of Engineers for approval.
 
 
 7
 Indeed, the whole transaction was a windfall to Electric Supply.[6] More than that the subcontractor agreed in writing and directed the general contractor to have joint checks issued to it and L & P in recognition of the supplying of materials by L & P and their receipt and use by the subcontractor and the general contractor.
 
 
 8
 The actions of the parties count for much. 'Substance controls. * * * Thus, the basis of the Miller Act protection * * * is not primarily to be grounded on what the parties may be called or named, whether by themselves or others. On the other hand, it is a qualitative determination of the substantive, and the functional role of performance of the parties under the circumstances, the 'character', that is vital to the issue.' United States ex rel., Acme Furnace Fitting Co. v. Fort George G. Meade, Md., 1960, 186 F.Supp. 639, 652.
 
 
 9
 On all the facts the Court could determine that L & P was the supplier. That is the end of it.
 
 
 10
 Affirmed.
 
 
 
 [1]
 40 U.S.C.A. 270a-270d
 
 
 [2]
 Pursuant to Rule 18 of the Rules of this Court we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 5 Cir., 1969, 409 F.2d 804, Part I; and Huth v. Southern Pacific Co., 5 Cir., 1969, 417 F.2d 526, Part I
 Determination on the merits means, of course, that appellee's motion to dismiss the appeal is denied. Not until July 3, 1969 was there a judgment disposing of all claims and parties and absent certification under F.R.Civ.P. 54(b) there was no final appealable order. Notice of appeal was timely given after that date.
 
 
 [3]
 The surety bond is called for by 40 U.S.C.A. 270a
 
 
 [4]
 'Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond * * *.'
 40 U.S.C.A. 270b (a).
 
 
 [5]
 Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tompkins Co., 1944, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163
 'The proviso of Section 2(a), which had no counterpart in the Heard Act, makes clear that the right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-contractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act. Moreover, it would lead to the absurd result of requiring notice from persons in direct contractual relationship with a subcontractor but not from more remote claimants.'
 Footnote 5 in MacEvoy cites to the legislative history:
 'A sub-contractor may avail himself of the protection of the bond by giving written notice to the contractor, but that is as far as the bill goes. It is not felt that more remote relationships ought to come within the purview of the bond.' H.Rep. No. 1263 (74th Cong. 1st Sess.) p. 3.
 
 
 [6]
 This is best revealed by the uncontradicted testimony of Electric Supply's representative
 'Q Now, in connection with the purchase order that we are talking about, isn't it a matter of fact that all that you did was go out and meet with Milton Fewell (manufacturer's representative of L & P) and Lloyd Dyal (President of Southeastern) and take an order that had already been pre-determined between them?
 A That's right.
 Q That is all that you did?
 A The order was handed to me, from the salesman's standpoint, by the contractor; yes.
 Q Now, Murray Smith, your boss, or employer, told you that, 'If you go out to Southeastern Electrical', there was an order that you could take out there. Right?
 A Right.
 Q You went out there and you met Milton Fewell and Lloyd Dyal?
 A Yes.
 Q And they told you the quantity, price, and everything else that was to be a price of this order. Is that not correct?
 A Yes.
 Q The price, in that regard, to the ultimate contractor, was pre-determined?
 A This is true.
 Q So, when you told Mr. Zook that between the billing from Light & Power to Electric Supply and Electric Supply to Southeastern, there was something added for handling * * *. That additional sum had already been pre-determined when you came to meet Fewell and Dyal. Correct?
 A I assume it was.
 Q What?
 A I say, we were handed a purchase order from Southeastern that was in excess of the cost of Light & Power and so it had to be pre-determined.
 Q So whatever distributor's fee, brokerage commission, handling charge-- whatever Electric Supply was supposed to get as being the local distributor-- was a pre-determined factor in the price that was given to you?
 A Yes.
 Q You didn't sell this job. You didn't go out and solicit it or negotiate it or determine anything?
 A No.
 Q You were just an order-taker?
 A That is all a salesman is anyhow.
 Q Particularly in this situation. Is that right?
 A Yes.'
 He also stated: 'I mean, from a salesman's point of view, it isn't everyday that you have someone ask you to write an order for $21,000. Milton Fewell asked me if I wanted to write the order and he had me copy down the list of fixtures and I turned the Salesman's Report in to the office for the fixtures to be furnished.'